**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In Re:<br><br>JACOB BLETNITSKY,<br>                    Debtor. | Chapter 7<br><br>Case No. 22-10701<br><br>Hon. Jacqueline P. Cox |
| DR. STEPHEN LIPPITZ,<br>                    Plaintiff,<br>v.<br><br>JACOB BLETNITSKY,<br>                    Defendant. | Adv. Pro. No. |

**ADVERSARY COMPLAINT**

**INTRODUCTION**

1. Plaintiff, Dr. Stephen Lippitz ("Dr. Lippitz"), bring this Adversary Proceeding against Debtor, Jacob Bletnitsky ("Debtor" or "Bletnitsky") seeking a determination that Debtor's debt to Lippitz (Claim No. 13-1 in the amount of $1,134,770.02) is not dischargeable as the debt was procured by false pretenses, Debtor's false representations and/or Debtor's actual fraud. As such, it is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(c)(1).

**JURISDICTION AND VENUE**

2. On September 19, 2022 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). The filing of Debtor's petition commenced a bankruptcy case pending before this Court under chapter 7 of the Bankruptcy Code and styled as *In re Jacob Bletnitsky*, Case No. 22-10701 (the "Bletnitsky Case").

3. Upon the filing of the Bletnitsky Case, Norman B. Newman was appointed as the chapter 7 trustee of the Bletnitsky Case.

1

4. The claims asserted in this adversary proceeding arise under the Bankruptcy Code and arise in the Bletnitsky Case. Accordingly, this Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b), and 1334(b) and pursuant to Local Rule 40.3.1 of the Local Rules of the District Court for the Northern District of Illinois.

5. This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b)(2).

6. To the extent that it is determined that (i) any portion of this adversary proceeding is not a core proceeding or (ii) a bankruptcy court lacks the constitutional authority to enter final orders or judgment in this adversary proceeding, Plaintiff consents, under 28 U.S.C. § 157(c)(2), to the entry of final orders or judgment in this adversary proceeding by the bankruptcy court.

7. This adversary proceeding relates to the Bletnitsky Case, which is a case under the Bankruptcy Code.

8. Pursuant to 28 U.S.C. § 1409(a), the Northern District of Illinois is the proper venue for this adversary proceeding.

**PARTIES**

9. Dr. Stephen Lippitz is an individual residing at 606 West Stratford, Chicago, Illinois in Cook County, Illinois.

10. Jacob Bletnitsky is an individual residing at 1400 South Michigan Avenue, Apt. 2801, Chicago, Illinois in Cook County, Illinois.

**RELEVANT FACTUAL BACKGROUND RELATING TO LIPPITZ JUDGMENT**

11. In or around June 2010, Bletnitsky formed JAD Holding Company, LLC ("JAD Holding"), which Bletnitsky allegedly formed to own all of the economic interests of a "Special Purpose Entity" called JAD Gaming, LLC ("JAD Gaming"). JAD Gaming was formed to become a licensed terminal operator under the Illinois Video Gaming Act.

2

Bletnitsky held himself out as the President of JAD Management, LLC, which was the Manager of JAD Holding. At all relevant times, Bletnitsky solely controlled the operations of JAD Holding, JAD Gaming and JAD Management, LLC.

12. Also in or around June 2010, JAD Holding issued a Confidential Private Placement Memorandum (the "PPM") designed to raise up to $6,000,000 in Class B interests in JAD Holding. The PPM contained a series of material, written representations designed to provide information to potential investors and entice those prospective investors to invest significant capital into JAD Holding.

13. Bletnitsky was one of four Class A investors in JAD Holding, but Bletnitsky only invested a nominal amount of his own money into JAD Holding. In contrast, the Class B investors were the principal investors of capital into JAD Holding. Dr. Lippitz was one of those Class B investors, and invested $1 million into JAD Holding in reliance on the PPM and the other representations made by Bletnitsky. While Bletnitsky wanted to raise $6 million through Class B investors, he was only able to raise $2 million from Class B Investors, including the $1 million investment made by Dr. Lippitz.

14. Bletnitsky had no prior history in the gaming industry.

15. Through the PPM, Bletnitsky represented that JAD Holding would not spend more than 5% of the proceeds obtained from the Class B investors through the PPM prior to JAD Gaming actually obtaining a video gaming license. Thus, with only $2 million in proceeds arising from the PPM Offering, Bletnitsky was limited (per the PPM) to spending only $100,000 of those proceeds in his attempt to have JAD Gaming obtain a video gaming license.

16. Bletnitsky hired Ed Plotkin to be an alleged gaming consultant to help Bletnitsky with JAD Gaming's application to obtain a video gaming license from the Illinois Gaming Board.

17. Neither JAD Holding nor JAD Gaming ever acquired any real estate in connection with JAD Gaming's efforts to obtain a video gaming license. Neither JAD Holding nor JAD Gaming ever acquired any video gaming terminals nor did they ever acquire any physical assets.

18. Without a written lease, JAD Gaming "rented" office space at 1250 South Michigan, which was the same office owned and controlled at the time by another one of Bletnitsky's entities at the time. As a result, Bletnitsky was using money from the Class B investors in JAD Gaming to pay himself rent.

19. JAD Gaming never achieved any revenue, but it paid Ed Plotkin (Bletnitsky's friend) close to $240,000 for alleged consulting services provided by Plotkin. The Illinois Gaming Board, at a later date, independently determined that Mr. Plotkin was not suitable to participate in video gaming in the State of Illinois.

20. According to JAD Holding's business records, JAD Holding/JAD Gaming spent *close to $1 million* in expenses attempting to obtain a video gaming license. Bletnitsky represented that JAD Holding would not incur expenses in excess of "5% of the proceeds of the Offering." However, and unbeknownst to Lippitz and the other Class B investors, Bletnitsky and JAD Holding incurred expenses well in excess of this 5% promised limitation, as set forth in the PPM.

21. JAD Gaming's only purported assets were unenforceable written contracts with unlicensed terminal operators and unlicensed gaming establishments where JAD Gaming could (theoretically) install its video gaming terminals *if and only if* JAD Gaming obtained a video gaming license. A large number of these unlicensed, potential gaming establishments were located in a municipality that had not yet even opted into video gaming. At bottom, these 94 contracts were effectively worthless or close to worthless.

22. Neither JAD Holding nor JAD Gaming ever made a distribution of profits to any of the Class B investors because JAD Gaming never generated any revenue, despite inappropriately spending close to $1 million of the Class B investors' money.

23. Pursuant to the PPM, Bletnitsky was not supposed to receive a salary. Yet, in violation of the PPM, Bletnitsky paid himself a monthly salary of approximately $10,000 per month for close to two years.

24. In early June 2012, and while JAD Gaming's video gaming license application was still pending, Bletnitsky approached Dr. Lippitz seeking a "personal loan" of $1 million from Dr. Lippitz.

25. Bletnitsky represented to Dr. Lippitz that he needed this loan in connection with JAD Gaming. More specifically, Bletnitsky represented that he needed a $1 million loan from Lippitz to buy out two of the Class A investors who had been deemed "unsuitable" by the Illinois Gaming Board. This representation was false, as Bletnitsky needed less than $100,000 at the time to buy out all of the Class A investors (excluding Bletnitsky, who did not invest any of his own money in JAD Holding).

26. As a further inducement to obtain the anticipated loan from Dr. Lippitz, Bletnitsky also represented that he had "more than the required assets and net worth to cover any concerns regarding" the repayment of the anticipated $1 million loan. This representation was also false.

27. As a still further inducement to obtain the anticipated loan from Dr. Lippitz, Bletnitsky also represented that "JAD Gaming is expected to receive [a video gaming license by] the end of July, 2012." This representation was also false.

28. As a further inducement to obtain the anticipated loan from Dr. Lippitz, Bletnitsky represented that he was in the process of acquiring "an additional 45% of the Class A shares in JAD Holding during the week of June 18, 2012." This representation was also false.

5

29. At the time Bletnitsky sought the $1 million loan from Dr. Lippitz, there was no need (as of yet) to buy out the Class B investors because JAD Gaming's video gaming license application was still pending. Thus, the alleged purpose of the loan, according to Bletnitsky, was solely to buy out certain Class A investors who had been deemed "unsuitable" by the Illinois Gaming Board. Again, this representation by Bletnitsky was false.

30. In reliance on the oral and written representations made by Bletnitsky, Lippitz agreed to loan Bletnitsky up to $1 million pursuant to the terms of a Promissory Note and Loan Agreement, both of which were dated as of June 20, 2012.

31. On June 20, 2012, and pursuant to the terms in the Promissory Note and Loan Agreement, Dr. Lippitz wired $600,000 to Bletnitsky's personal checking account pursuant to the wire transfer instructions provided by Bletnitsky.

32. On or about July 27, 2012, the Illinois Gaming Board denied JAD Gaming's video gaming license application. The IGB indicated that it was denying JAD Gaming's application because "JAD Gaming, LLC through its employee and Owner, Jacob Bletnitsky, has associated both personally and professionally with persons of notorious and unsavory reputation."

33. Years later and during the discovery phase of the lawsuit initiated by Dr. Lippitz, as discussed *infra*, Bletnitsky testified that he needed to use the proceeds from the Lippitz loan to pay back the Class B investors following the IGB's denial of JAD Gaming's license application. However, Bletnitsky's testimony serves as an admission by Bletnitsky that his prior representations to Dr. Lippitz as to the purpose of loan were false and further reveals the fraud Bletnitsky committed in connection with monies he received from the Class B investors pursuant to the PPM.

34. Indeed, if Bletnitsky had abided by the terms in the PPM, there would have been more than sufficient funds to repay the Class B investors when the IGB denied JAD Gaming's

application. However, consistent with his ongoing fraudulent conduct, Bletnitsky did not have sufficient funds remaining in the JAD Gaming bank account to repay the monies due to the Class B investors.

35. The terms of the Promissory Note and Loan Agreement required Bletnitsky to repay the loan with interest on or before June 20, 2014. However, Bletnitsky never repaid a single dime of the monies owed to Dr. Lippitz.

36. As a result, Dr. Lippitz ultimately had to file a lawsuit against Bletnitsky in June 2019 in the Circuit Court of Cook County, Illinois (Case No. 2019 L 6974) seeking repayment of the amounts due and owing pursuant to the Promissory Note and Loan Agreement.

37. In response, Bletnitsky filed a frivolous counterclaim, which resulted in Dr. Lippitz having to spend additional attorneys' fees defending against Bletnitsky's frivolous counterclaims.

38. Ultimately, on June 3, 2022, Dr. Lippitz was awarded a final judgment against Bletnitsky in the amount of $1,105,600.75.

39. In Schedule E/F of Debtor's Petition, Debtor admits that he owes Dr. Lippitz $1,126,656.82 as the result of the entry of a judgment entered against Debtor (the "Lippitz Judgment").

40. On February 9, 2023, Dr. Lippitz filed his Proof of Claim in the Bankruptcy Case as Claim No. 13-1 seeking recovery of the Lippitz Judgment in an amount equal to $1,134,770.02. Bletnitsky has not objected to Dr. Lippitz's claim.

**COUNT I**
**(Nondischargeability of Debt for Lippitz Judgment – 11 U.S. C. § 523(a)(2)(A))**

41. Dr. Stephen Lippitz repeats and incorporates by reference herein the allegations set forth in paragraphs 1 through 40.

42. As set forth *supra*, Bletnitsky made a series of false and fraudulent oral and written representations to Dr. Lippitz for the purpose of inducing Dr. Lippitz to make a loan in the

7

amount of $600,000 to Bletnitsky. Indeed, Bletnitsky obtained the loan under false pretenses including representing to Dr. Lippitz that Bletnitsky needed the funds to buy out certain Class A investors and that he had more than the required net worth and assets to repay the loan. These representations were false and fraudulent and were made solely to induce Dr. Lippitz to make the loan.

43. Bletnitsky also engaged in fraudulent conduct in connection with his operation of JAD Holding/JAD Gaming, and used investors' money for his own personal use and in stark violation of the terms set forth in the PPM.

44. Dr. Lippitz justifiably and reasonably relied on the oral and written representations made by Bletnitsky in connection with making the loan to Bletnitsky.

45. Bletnitsky was able to obtain the loan from Dr. Lippitz through false pretenses and as a direct result of his fraudulent representations. Lippitz first learned of Bletnitsky's fraudulent conduct through discovery conducted in connection with the state court lawsuit which ultimately led to Dr. Lippitz obtaining the Lippitz Judgment.

46. Bletnitsky's debt to Lippitz was obtained by false pretenses, false representations and/or actual fraud in connection with both the loan and the fraudulent manner in which Bletnitsky operated JAD Holding and JAD Gaming in direct violation of the written representations made to investors, including Lippitz, in the PPM.

47. Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(c)(1), Lippitz is entitled to a determination by this Court that Bletnitsky's debt to Lippitz is to be excepted from discharge in the Bletnitsky Case.

### REQUESTS FOR RELIEF

WHEREFORE, Creditor, Dr. Stephen Lippitz, respectfully requests that this Court enter a Judgment in their favor providing them with the following relief:

A.  With respect to Count I, enter judgment in favor of Dr. Stephen Lippitz determining that Bletnitsky owes Dr. Lippitz a debt for the Lippitz Judgment and such debt arose from money, property or services obtained by false pretenses, a false representation, or actual fraud, and that pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(c)(1), this debt, i.e. the Lippitz Judgment, is excepted from discharge in the Bletnitsky Case.

B.  Granting Dr. Lippitz such other and further relief as the Court deems just and appropriate.

Dated: July 30, 2024

Respectfully submitted,

CREDITOR, DR. STEPHEN LIPPITZ

/s/ Richard A. Saldinger
One of Creditor Dr. Lippitz's Attorneys

Richard A. Saldinger (ARDC No. 6209930)
Landsman Saldinger Carroll, PLLC
Attorney for Creditor, Dr. Stephen Lippitz
161 N. Clark, Suite 1600
Chicago, IL  60601
Tel. (312) 291-4650
saldinger@lsclegal.com